# In the United States District Court for the Southern District of Georgia Brunswick Division

MARC F. GLISSMAN,

    Plaintiff,

v.

WILLIAM GROSS and W.H. GROSS CONSTRUCTION COMPANY,

    Defendants.

No. 2:17-cv-39

## ORDER

This matter comes before the Court on the Motion for Summary Judgment of Defendants William Gross and W.H. Gross Construction Company ("Gross Construction"). Dkt. No. 19. This Motion is ripe for review. For the following reasons, Gross's Motion is **DENIED**, and Gross Construction's Motion is **GRANTED**.

## BACKGROUND FACTS

This dispute concerns the existence of a contract in the context of a failed water park development in Kingsland, Georgia. Specifically, Michael Elzufon formed Epic Adventures Resort I, LLC ("Epic Adventures") in 2012 in pursuit of a destination tourism concept ("the Project") to include a water park, amusement park, lodging, retail, and entertainment.

Defendants' Statement of Undisputed Material Facts ("SUMF"),[1] Dkt. No. 19-1 ¶ 1; Dkt. No. 19-2, Ex. A. Epic Adventures, in turn, entered into a project agreement with the Georgia Gateway Improvement District and the city of Kingsland, Georgia. SUMF ¶ 2; Dkt. No. 19-2, Ex. B. Defendant Gross and others entered into an agreement to sell certain properties to Epic Adventures for the location of the Project. SUMF ¶ 4; Dkt. No. 19-2, Ex. C. The sale included owner financing and the subordination of Defendants' security interest to a $500,000 (later increased to $650,000) loan by a third party to Elzufon. SUMF ¶ 5; Dkt. No. 19-2, Exs. D, T.

To get the Project off the ground, Elzufon contacted Plaintiff Glissman for his experience in the development and operation of water parks. SUMF ¶ 6; Dkt. No. 21-1, 17:6-10. After discussions between Elzufon and Glissman, Glissman sent Elzufon the following email on January 8, 2015 ("the Jan. 8 email"):

> Previously we discussed the best route to take regarding compensation and I wanted to share some of my thoughts with you.
>
> 1099 Compensation: $2800 weekly (payable bi-weekly) plus any applicable travel expenses
>
> W-2 Compensation: $130,000 annually (payable bi-weekly) plus any applicable travel expenses (Please note: no insurance benefits necessary, as my wife handles these through her employer.)

---

[1] Throughout this order, the Court cites only those paragraphs from Defendants' SUMF that Plaintiff specifically fails to dispute.

AO 72A
(Rev. 8/82)

If you prefer an hourly rate, I'm happy to provide those numbers as well. However, with the amount of work we have to do, I feel this option may be more costly overall.

Regarding travel, please advise on how you wish to handle these expenses. Would I absorb these costs on a personal credit card and submit for reimbursement or would I have access to a company credit card?

I really appreciate the opportunity to work with you on this outstanding project. I am extremely excited to be on the front end of this project and look forward to seeing it through to completion.

Please let me know if you have any questions. I look forward to hearing your thoughts.

Thanks, Marc

SUMF ¶ 7; Dkt. No. 19-2, Ex. F.

A few days later, Elzufon transmitted a notice to Gross that Epic Adventures had named Glissman to its executive management team. SUMF ¶ 9; Dkt. No. 19-2, Ex. H. Throughout these interactions, Glissman never discussed with Elzufon, Gross, or anyone related to the Project which entity employed him. Dkt. No. 21-1, pp. 41-42.

After some period of time, Glissman was not receiving compensation.[2] To address this problem, he spoke first with Elzufon then with Gross. Dkt. No. 21-1, p. 30. Elzufon told Glissman that funding would be coming in any day. <u>Id.</u> Gross told Glissman the same thing. <u>Id.</u> More specifically, Gross told Glissman he wanted to ensure that he (Glissman) would get

---

[2] It is unclear in the record presently before the Court exactly when this occurred.

paid and that he (Gross) was working every angle on bridge loans to fulfill that obligation. Id. 51-52.

Elzufon was criminally indicted in February 2015, ceasing his involvement with the Project. Dkt. No. 21-1 51:5-7. Glissman testified that, at that point, Gross became his main contact for the Project. Id. 51:8-12. Glissman also testified that he and Gross then had discussions regarding his (Glissman's) compensation, that Glissman forwarded the previous terms to Gross, and that Gross agreed to those same terms. Id. 51-53.

Elzufon defaulted on his promissory note with Gross, who subsequently terminated the sales agreement. SUMF ¶ 10; Dkt. No. 19-2, Ex. I. Following Elzufon's unavailability, Gross formed the entity Epic Destinations, LLC on April 10, 2015. SUMF ¶ 11; Dkt. No. 19-2, Ex. J. Epic Destinations, in turn, entered into a project agreement (as had Epic Adventures) with the Georgia Gateway CID and the city of Kingsland. SUMF ¶ 12; Dkt. No. 19-2, Ex. K. Defendants contend that "the bridge loan funds" were to be used in connection with the Project if successful for compensation of persons including Glissman. Dkt. No. 19-1 ¶ 13 (citing Dkt. No. 19-2, Ex. L). Plaintiff contends, to the contrary, that his compensation was never contingent upon financing and that he never discussed making his

compensation contingent upon a bridge loan. Dkt. No. 20-1 ¶ 13 (citing Dkt. No. 21-1 53:4-17).

Defendant produced a spreadsheet reflecting three payments made to Glissman with the line item "Epic Project (Job)." Dkt. No. 19-2, Ex. P. A $5,000 payment was made on September 1, 2015. Id. A $3,500 payment was made on November 11, 2015, and a $4,000 payment was made on December 9, 2015. Id. Plaintiff contends these payments represent partial compensation; Defendant contends these payments were an advance for expenses.

In any event, Glissman worked on the Project from January 2015 to March 2016. He now brings a breach of contract claim (or, in the alternative, quantum meruit) seeking $168,000 and bad faith damages from Gross and Gross Construction.

## LEGAL STANDARD

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In making this determination, the court is to view all of

the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant must show the court that there is an absence of evidence to support the nonmoving party's case. Id. at 325. If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

The nonmovant may satisfy this burden in one of two ways. First, the nonmovant "may show that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion, which was 'overlooked or ignored' by the moving party, who has thus failed to meet the initial burden of showing an absence of evidence." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993) (quoting Celotex Corp., 477 U.S. at 332 (Brennan, J., dissenting)). Second, the nonmovant "may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. Where the nonmovant

attempts to carry this burden instead with nothing more "than a repetition of his conclusional allegations, summary judgment for the defendants [is] not only proper but required." Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981) (citing Fed. R. Civ. P. 56(e)).

**DISCUSSION**

In their Motion for Summary Judgment, Defendants argue that there was no contract as a matter of law, that they are not parties to any contract Glissman may have had with Elzufon, and that the Statute of Frauds bars Glissman's claims. The Court will take up each argument in turn.

**I. Is there a contract?**

"To constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate." O.C.G.A. § 13-3-1. "The consent of the parties being essential to a contract, until each has assented to all the terms, there is no binding contract; until assented to, each party may withdraw his bid or proposition." O.C.G.A. § 13-3-2.

Viewed in the light most favorable to him, Plaintiff has produced sufficient evidence from which a reasonable juror could conclude that he and Elzufon made a contract. While Plaintiff does not assert that the Jan. 8 email constituted the contract,

he argues correctly that it reflected an oral agreement between them, sufficient to withstand an award of summary judgment to Defendant. Plaintiff testified that: Elzufon sought him out for his related experience in waterpark development and management; Elzufon hired him; Elzufon agreed to compensate him at a rate of $2,800 weekly. Finally, the record shows that Elzufon notified Gross that Glissman had been added to the executive management team.

Viewed in the light most favorable to him, Plaintiff has also produced sufficient evidence from which a reasonable juror could conclude that he and Gross made a contract after Elzufon was indicted. Plaintiff testified that, in order to entice Plaintiff to remain on the Project, Gross agreed to pay Plaintiff under the same terms that he and Elzufon had initially agreed upon. Dkt. No. 21-1, pp. 51-53. Plaintiff's testimony supports the following: after Elzufon was indicted in February 2015, Gross became Glissman's main point of contact on the Project; Glissman and Gross subsequently had conversations regarding Glissman's compensation; Glissman sent Gross in writing the terms of his previous agreement with Elzufon; Gross agreed to those same terms. Id.

True, Gross argues that he did not assent to the terms that Glissman articulated. But Glissman testified that he did. So there is a genuine issue of material fact regarding whether

AO 72A
(Rev. 8/82)

8

Gross agreed to compensate Glissman for his continued services on the Project. Therefore, the Court cannot hold as a matter of law that Glissman and Gross made no contract, and Gross's request for summary judgment on the existence of the contract must be denied.

Defendants also argue that whatever agreement may have existed lacked sufficient material terms to be legally enforceable. They cite <u>Burns v. Dees</u> for the proposition that a contract cannot be enforced if its terms are incomplete, vague, indefinite, or uncertain and <u>Dong v. Shepeard Community Blood Center</u> for the proposition that an employment contract for an indefinite period of time is unenforceable. 557 S.E.2d 32 (Ga. Ct. App. 2001); 522 S.E.2d 720 (Ga. Ct. App. 1999). His reliance on both is misguided.

The court held the agreement in <u>Burns</u> unenforceably indefinite where the promisor allegedly promised "an unspecified interest" for his work on "other ventures." 557 S.E.2d at 35. Such terms do not govern the present contract.

<u>Dong</u> is not a breach of contract case at all. Instead, the court there held that the plaintiff's claim for tortious interference with her employment relationship failed where her employment was at-will. The effect of the indefinite period of employment was not—as Defendant would have the Court hold here—that there was no employment relationship or that there was no

AO 72A
(Rev. 8/82)

contract. No, the effect of the indefiniteness of the period was that the employment was terminable at will and thus could not support a cause for wrongful termination. Id. (citing O.C.G.A. § 34-7-1). Here, the Court cannot say at this stage that the contract is unenforceably vague.

**II. Does the Statute of Frauds bar Glissman's claims?**

Plaintifff contends that the email he sent to Elzufon reflected the terms of an oral agreement they had made. While an oral agreement is no less valid than a written one, Georgia's Statute of Frauds requires some agreements to be in writing in order to be enforceable. Notably here, "any agreement that is not to be performed within one year from the making thereof" and "a promise to answer for the debt, default, or miscarriage of another." O.C.G.A. § 13-5-30(2), (5). Such agreements must be in writing and signed by the person to be charged therewith. Id.

Defendant first contends that the agreement was not to be performed within a year. He argues in support that Glissman's period of employment lasted thirteen or fourteen months. "The agreement is not limited to a period of time less than one year," Defendant argues, and "[i]t is clear from Plaintiff Glissman's deposition testimony that the period of time for which his claim of a contract existed was in excess of the one year requirement." Dkt. No. 19, p. 8.

10

On this point, Georgia law is clear: "[T]o fall within the ambit of this statutory provision, a contract must be incapable of being performed within a year; the possibility of performance of the contract within one year is sufficient to remove it from the Statute of Frauds." Bithoney v. Fulton-DeKalb Hosp. Auth., 721 S.E.2d 577 (Ga. Ct. App. 2011). "[I]f the promise may possibly be performed within a year, it does not fall within this provision." Henry v. Blankenship, 621 S.E.2d 601 (Ga. Ct. App. 2005). A promise which is not likely to be performed within a year, and which in fact is not performed within a year, is not within the statute of frauds if at the time the contract is made there is a possibility in law and in fact that full performance such as the parties intended may be completed before the expiration of a year. Vernon v. Assurance Forensic Accounting, LLC, 774 S.E.2d 197 (Ga. Ct. App. 2015). More specific to the employment context, the "fact that an at-will contract of employment actually lasts several years does not bring the contract within the statute, since either party could put an end to the contract within one year, and the contract would thereby be fully performed." Williston on Contracts § 24:3 (citing Parker v. Crider Poultry Inc., 565 S.E.2d 797 (Ga. 2002)). The Supreme Court, too, has spoken on the subject: "The parties may well have expected that the contract would continue in force for more than one year, it may have been very improbable that it

would not do so; and it did in fact continue in force for a much longer time. But they made no stipulation which in terms, or by reasonable inference, required that result. The question is not what the probable, or expected, or actual performance of the contract was, but whether the contract, according to the reasonable interpretation of its terms, required that it should not be performed within the year." Warner v. Tex. & P. Ry. Co., 164 U.S. 418, 434 (1896) (the contractual duration was "as long as he needed it," which turned out to be thirteen years, and still it did not fall within the statute).

Here, there is no evidence that the agreement between Glissman and Elzufon specified a definite duration. Nor is there any evidence that the agreement between Glissman and Gross specified a definite duration. "A contract of employment of indefinite duration does not fall within the Statute of Frauds. . . . This is so because, at its inception, a contract of employment for an indefinite duration is an agreement capable of being performed within one year, and the possibility of performance of the contract within one year is sufficient to remove it from the statute of frauds." Parker, 565 S.E.2d at 798-99.

Defendant cites Morgan v. American Insurance Managers, Inc., for the proposition that employment agreements for a definite term not to be performed with a year fall within the

Statute of Frauds. 521 S.E.2d 676 (Ga. Ct. App. 1999). That is correct. But as previously pointed out, this agreement had no definite term of duration.

Defendants next argue—less fulsomely—that the agreement falls within the Statute of Frauds because it is a promise to answer for the debt of another. The applicability of this provision turns on whether the promise at issue is "collateral," "secondary," or "superadded" to that of another party or whether the promise is an "original undertaking." An original undertaking is one where the promisor is "furthering his own interests rather than underwriting the debt of another." John K. Larkins, Jr., Ga. Contracts Law and Lit. § 6.3 (2d ed.). Statements such as "I'll see that he gets paid" or words to that effect ordinarily indicate an original undertaking whereas a statement like "if he fails to pay, then I'll pay" indicates a collateral promise. Id. (citing Lewis v. Dan Vaden Chevrolet, Inc., 236 S.E.2d 866 (Ga. Ct. App. 1977); Bennett Oil Co. v. Harrell, 238 S.E.2d 267 (Ga. Ct. App. 1977)). An original undertaking exists where one debtor is substituted for another. Id. (citing Donald H. Gordon Co. v. Carswell, 362 S.E.2d 483 (Ga. Ct. App. 1987)). The crucial distinction between an original undertaker and an underwriter is whether the new promisor is furthering his own interests. Robin C. Larner, Ga.

Jur. § 1:46 (citing <u>Schwab U.S.A., Inc. v. Perpetual Machine Co.</u>, 525 S.E.2d 719 (Ga. Ct. App. 1999)).

"[T]hose promises required by the statute to be in writing do not include an original undertaking in which the new promisor, for valuable consideration, substitutes himself as the party who is to perform and the original promisor is released." <u>Donald H. Gordon Co. v. Carswell</u>, 362 S.E.2d 483 (Ga. Ct. App. 1987).

In this case, Plaintiff has produced sufficient evidence to withstand summary judgment that Gross made an original undertaking instead of a promise to pay for the debt of another. Because Gross remained on the Project after Elzufon had been removed from it, Gross was furthering his own interests rather than Elzufon's interests in maintaining Glissman's employment on the Project. Glissman testified that Gross "wanted to ensure me that I was going to be paid and that he was working every angle on bridge loans and so forth to make sure that he could fulfill that obligation. He also discussed with me that he would look into his tax credit business and possibly pay me through his tax credit business funds." Dkt. No. 21-1 51:23-52:4. This statement is more like "I'll see that he gets paid" than "if somebody else fails to pay, I'll pay." The Court cannot hold as a matter of law that Gross's promise to compensate Glissman was

AO 72A
(Rev. 8/82)

the promise to answer for the debt of another. Gross is not precluded from presenting this argument to a jury.

Because this agreement does not fall within the Statute of Frauds, the Court need not analyze whether partial performance provided clear and convincing evidence of the contract.

### III. Is there sufficient evidence for Glissman's quantum meruit claim?

Plaintiff has brought the alternative claim of quantum meruit in the event that his breach of contract claim fails. (Where an express contract exists, there can be no recovery in quantum meruit. <u>Blueshift, Inc. v. Advanced Computing Techs., Inc.</u>, 616 S.E.2d 816 (Ga. Ct. App. 2005)). Defendant requests summary judgment on the quantum meruit claim, arguing that Plaintiff has failed to produce any evidence of value conferred on Defendants.

Quantum meruit under Georgia law has four elements: (1) the performance of valuable services (2) that are accepted or requested by the defendant (3) for which failure to compensate the provider would be unjust and (4) the plaintiff performed with the expectation of compensation. <u>Amend v. 485 Props.</u>, 627 S.E.2d 565, 568-69 (Ga. 2006).

"'Value' means value to the owner rather than the cost of producing the result to the workman." <u>Bowen v. Ken-Mar Constr. Co., Inc.</u>, 244 S.E.2d 646, 647 (Ga. Ct. App. 1978) (citing

Brumby v. Smith & Plaster Co. of Ga., 181 S.E.2d 303, 305 (Ga. Ct. App. 1971)). Proof of "the reasonable value of services rendered to and accepted by [a defendant is] an element essential to recovery on a quantum meruit basis." Diegert v. Cedarbrook Homes, Inc., 599 S.E.2d 211, 212 (Ga. Ct. App. 2004). "'Value, as any other matter to be proved, may be shown circumstantially or inferentially as well as directly or positively.'" Nextel S. Corp. v. R.A. Clark Consulting, Ltd., 596 S.E.2d 416, 419 (Ga. Ct. App. 2004) (quoting Centre Pointe Invs. V. Frank M. Darby, 549 S.E.2d 435, 439 (Ga. Ct. App. 2001)).

Here, Plaintiff testified that $120,000 annually was a typical value for his services. He also testified that Elzufon valued his services in the present case at $2,800 weekly. The Georgia Court of Appeals has specifically held that testimony regarding the typical charge for services is evidence of value conferred in a quantum meruit claim. Nextel, 596 S.E.2d at 419. Thus, at this stage of the case, Glissman has produced sufficient evidence that he conferred a benefit to Gross.

Further, Glissman has produced sufficient evidence of each element of quantum meruit. He presented evidence that he performed services as an executive management team member for the Project from January 2015 to March 2017. Though Gross was not the one who initially hired Glissman for the job, he

AO 72A
(Rev. 8/82)

accepted the benefit of those services before and after Elzufon was indicted. Specifically, Elzufon relayed to Gross that he had hired Glissman onto the executive management team for the Project. After Elzufon was indicted, Gross initiated contact with Glissman expressing an expectation that Glissman's services would continue. Plaintiff testified that he expected compensation of $2,800 weekly for his services. He presented evidence that it would be unjust for him to have conferred such services to the Project without compensation.

**IV. Claims against Gross Construction**

Plaintiff Glissman has brought both of his claims—breach of contract and quantum meruit—against both Defendants. However, he has not produced sufficient evidence as to either cause of action to proceed against Gross Construction.

In fact, Gross Construction is never mentioned in the record evidence before the Court—not in Glissman's deposition, not in any other exhibit. While Glissman did testify that he was unsure about exactly which entity employed him, he has made no suggestion that it was Gross Construction. He produced no evidence that any of his conversations—whether orally or in writing—with Gross were in his representative capacity for Gross Construction.

Nor has Glissman produced evidence that Gross Construction received the benefit of his services. He produced no evidence

of Gross Construction's connection to the Project nor of any benefit it received for having Glissman on the Project. Moreover, Plaintiff's responsive brief failed to address Gross Construction's argument that Glissman's claims against it be dismissed.

## **CONCLUSION**

Defendant Gross's Motion for Summary Judgment on all claims is **DENIED**. Defendant W.H. Gross Construction Company's Motion for Summary Judgment on all claims is **GRANTED**.

**SO ORDERED**, this 2nd day of August, 2018.

HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA